IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| LORIN MOR AMSALEM, | § § § | |
| Petitioner, | § § | |
| v. | § § | 1:19-CV-119-RP |
| AVISHAY AMSALEM, | § § § | |
| Respondent. | § § | |

## ORDER

Before the Court is Lorin Mor Amsalem's petition filed pursuant to the Hague Convention on Civil Aspects of International Child Abduction (the "Convention"), codified by the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. 9000 *et seq.*, seeking the return of her children to Israel. (Compl., Dkt. 1). This Court held a full evidentiary hearing, during which the Court received evidence and heard sworn testimony. Having considered the evidence, testimony, and oral arguments presented during the hearing, along with the applicable law, the Court now enters the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a). Any findings of fact that should be construed as a conclusion of law is adopted as such. Any conclusion of law that should be construed as a finding of fact is adopted as such.

### I. BACKGROUND

This case arises out of a child custody dispute between estranged parents Lorin Mor Amsalem and Avishay Amsalem. Petitioner Lorin Mor Amsalem ("Lorin") alleges that Respondent Avishay Amsalem ("Avishay") has wrongfully retained their three children in the United States and seeks their immediate return to Israel. (Compl., Dkt. 1, at 3–4). Approximately three months after Lorin filed her Hague petition, she filed a motion for preliminary injunction asking the Court to (1) issue a temporary restraining order without notice to Avishay, (2) expedite the preliminary injunction

1

hearing, (3) consolidate the preliminary injunction hearing with a trial on the merits, and (4) order the Williamson County court to refrain from determining custody of the children until this action has been resolved. (Mot. Prelim. Inj., Dkt. 2, at 16). The Court denied the motion upon finding that Lorin had cited no facts clearly showing the risk of immediate and irreparable injury and did not certify her efforts to give notice to Avishay or explain why such effort should not be required. (Order, Dkt. 5, at 2–3). The Court set this case for an evidentiary hearing on November 13, 2019. (Dkt. 14). Both parties submitted trial briefs. (Pet. Br., Dkt. 18; Resp. Br., Dkt. 19). The hearing lasted two days. (Hr'g, Dkt. 20, 22). During the hearing, three witnesses testified: Lorin, Avishay, and Lorin's mother. (*Id.*). The Court heard closing arguments over the telephone on November 21, 2019. (Closing Arg., Dkt. 26).

After Lorin's counsel presented her case in chief, she moved to admit all exhibits attached to Lorin's motion for preliminary injunction pursuant to 22 U.S.C. § 9005. (Exs. 1–8, Dkt. 2). Avishay objected to the automatic admissibility of these documents. (Hr'g, Dkt. 20). While the Court admitted several of the documents during the course of the hearing, the Court did not rule on the admissibility of seven exhibits[1] filed as attachments to Lorin's motion for preliminary injunction, (Dkt. 2). The Court took Avishay's objection as to the remaining exhibits under advisement and ordered supplemental briefing on the issue of admissibility under 22 U.S.C. § 9005. The Court addresses the admissibility of these exhibits in this order. *See infra* Part III.A.

---

[1] While Avishay's brief contends there are eleven outstanding exhibits, (Resp. Admissibility Br., Dkt. 24, at 2–3), Lorin's brief notes that she no longer seeks to admit documents appended as Exhibit E to her motion for preliminary injunction. (Pet. Admissibility Br., Dkt. 25, at 2). Accordingly, the Court will not consider the admissibility of the documents submitted as Exhibit E. Thus, there are seven outstanding exhibits for the Court to address.

## II. FINDINGS OF FACT

The following facts have been established by the preponderance of the evidence.[2] Lorin and Avishay are Israeli nationals who married in 2005 in Israel. (Pet. Br., Dkt. 18, at 2). They are the parents of three children: I.M.A., A.A., and R.M.A. (*Id.*). I.M.A and A.A., the two eldest children, were born in Israel in 2010 and 2012, respectively. (Resp. Br., Dkt. 19, at 1). Their third child, R.M.A., was born in the United States on March 22, 2017. (R.M.A. Birth Certificate, Dkt. 28-2, at 71). The family resided in Israel until November 30, 2015, when Avishay accepted a job at Polycom USA, and the family moved to Austin, Texas. (Resp. Br., Dkt. 19, at 1). Before leaving Israel, Lorin notified her employer that she was moving to the United States and that her last day of work with the company would be November 25, 2015. (Resignation Letter, Dkt. 28-1, at 29 ("[I]n light of an opportunity that has come my way to move to the United States and to get to know a different culture, and a new job . . . I have no choice but to leave and seek new horizons.")). The family arrived in Austin, Texas on L-visas valid for five years. (Resp., Br., Dkt. 19, at 1; Amsalem Family L-visas, Dkt. 28-1, at 32–35).

After living in the United States for less than a month, Avishay signed a three-year car lease. (Lease Agreement, Dkt. 28-4, 14–16). Lorin's uncle co-signed the lease. (*Id.*). In the spring, Lorin inactivated her Israeli bar membership and applied for a U.S. work authorization permit. (Letter from the Israeli Bar Association, Dkt. 28-1, at 38; I-765 Application for Employment Authorization, Dkt. 28-1, at 36). Around the same time, Polycom agreed to sponsor the Amsalem family for permanent residency in the United States in exchange for Avishay's commitment to remain with the company for an additional two years. (Polycom Sponsorship Letter, Dkt. 28-2, at 47). In the fall of 2016, Avishay and Lorin notified the Israeli government they were no longer residents of Israel.

---

[2] The findings of fact are based on the testimony and other evidence presented at the hearing on November 13–14, and the parties' filings prior to the trial, including Lorin's Hague Petition, (Dkt. 1), Lorin's Motion for Preliminary Injunction, (Dkt. 2), and the parties' pre-trial briefs, (Pet. Br, Dkt. 18; Resp. Br., Dkt. 24).

(Lorin's Residency Letter, Dkt. 28-2, at 66; Avishay's Residency Letter, Dkt. 28-2, at 58). On October 13, 2016, Lorin received confirmation from the Israel National Insurance Institute that she was deemed a nonresident of Israel "[f]rom 01/01/2016 onwards." (Nonresident Confirmation Letter, Dkt. 28-2, at 69).

Throughout 2016, both Lorin and Avishay participated in the process of applying for legal permanent residency. (USCIS Form I-693, Dkt. 28-2 at 1; Amsalem Family Green Cards, Dkt. 28-2, at 29). This process involved submitting an application for legal permanent residency, getting fingerprinted, obtaining the necessary medical examinations, and attending family interviews at U.S. Citizenship and Immigration Services ("USCIS") centers. (Hr'g, Dkt. 20, 22; *see also* WhatsApp Msg., Dkt. 28-4, at 29 (showing Lorin inquiring about the status of the family's green cards). Because Lorin was pregnant at the time, she sought a waiver from USCIS's immunization requirement. (Immunization Waiver, Dkt. 28-2, at 10). When Avishay learned that the family's application for permanent residency had been approved, he texted Lorin, "[w]e are officially permanent residents of the United States." (WhatsApp Msg., Dkt. 28-4, at 29). On October 28, 2016, the Amsalem family received their green cards. (*See* Timeline, Dkt. 28-4, at 32; Amsalem Family Green Cards, Dkt. 28-2, at 29).

On March 22, 2017, the couple's third child, R.M.A, was born. (R.M.A. Birth Certificate, Dkt. 28-2, at 71). The family took no steps to register him as an Israeli citizen. (Hr'g, Dkt. 20). Instead, the couple applied for and ultimately obtained a U.S. Social Security number and U.S. passport for R.M.A. (R.M.A. Social Security Card, Dkt. 28-2, at 72; R.M.A. Passport, Dkt. 28-2, at 73). On August 18, 2017, the couple signed a new one-year lease for a house in Cedar Park, Texas. (*See* Timeline, Dkt. 28-4, at 32). Approximately two weeks before the family's two-year anniversary in the United States, the couple purchased roundtrip airline tickets to Israel to visit family and friends. (Roundtrip Airline Tickets, Dkt. 28-2, at 74–98). On November 30, 2017, the family's two-

year anniversary in the United States, the family still resided in Texas. (Hr'g, Dkt. 20). The family took no steps at that time to return to Israel. (*Id.*).

By the spring of 2018, the couple's marriage had deteriorated and Lorin began demanding that the family return to Israel. (Resp. Br., Dkt. 19, at 2). While the couple negotiated the terms of a possible return to Israel and signed an agreement in May 2018 stating they would "[s]tay in the US till December 2019 [w]hether the relationship is successful or not," they never moved back to Israel. (Avishay's Letter to Lorin, Dkt. 28-5, at 7; Avishay's Letter to Lorin, Dkt. 27-1, at 9; Agreement, Dkt. 28-5, at 1–3). On June 12, 2018, Avishay filed for divorce in Williamson County, Texas. (Pet. Br., Dkt. 18, at 3). The following day, the Williamson County court issued an ex parte temporary restraining order prohibiting the removal of the children from Texas or the United States and restricting the children's residence to Williamson County, Texas. (Pet., Br., Dkt. 18, at 3). The order further required Lorin to surrender the children's passports. (*Id.*). Accordingly, June 13, 2018 serves as the date of the alleged wrongful retention of the children in the United States.

On February 15, 2019, after the Williamson County action had been pending for approximately eight months, Lorin filed a Verified Petition for Return of Minor Children to Their Habitual Residence (Israel) pursuant to the Hague Convention and the International Child Abduction Remedies Act, 22 U.S.C. § 90001 *et seq.* (Compl., Dkt. 1). She did not request issuance of summons until May 4, 2019. (Mot. Request Summons, Dkt. 3). Lorin filed a Motion for Preliminary Injunction that same day. (Mot. Prelim. Inj., Dkt. 2). The Court denied the motion without prejudice. (Order, Dkt. 5).

### III. CONCLUSIONS OF LAW

#### A. Admissibility of Documents under 22 U.S.C. § 9005

During the evidentiary hearing held on November 13, 2019, Lorin moved for the admission of all exhibits attached to her motion for preliminary injunction, (Dkt. 2), pursuant to 22 U.S.C. §

5

9005. While many of these documents were admitted during the hearing, the Court has yet to rule on the admissibility of the following exhibits:

- Exhibit A-1, Petitioner's Letter to Respondent with translation, Dkt. 2-1, at 2–7;
- Exhibit A-4, Respondent's Text of July 4, 2018 with translation, Dkt. 2-1, at 18–21;
- Exhibit A-5, Respondent's Text of July 7, 2018 with translation, Dkt. 2-3, at 22–24;
- Exhibit C-1, Respondent's 18-month apartment lease, signed July 2018, Dkt. 2-3, at 2–13;
- Exhibit C-2, Petitioner's month-to-month apartment lease, Dkt. 2-3, at 14–21;
- Exhibit F, Respondent's Williamson County Divorce Petition, Dkt. 2-6;
- Exhibit H, Authorized Translation of Israel Capacity and Guardianship Law, Dkt. 2-8.

Avishay argues that these exhibits are not automatically admissible under § 9005 for two reasons. First, Avishay draws a distinction between documents attached to an application and documents attached to other petitions or motions before the Court. (Resp. Br., Dkt. 24, at 4–5). He contends that Article 30 of the Convention states that "documents attached to an *application* are admissible," but documents attached to other motions and petitions are not. (*Id.* at 3). Because Lorin seeks to admit documents attached to her motion for preliminary injunction, Avishay argues the relaxed authentication requirements under § 9005 do not apply. (*Id.* at 4–5). Second, Avishay argues that while ICARA removes *authentication* requirements, "nothing in ICARA provides for the blanket *admissibility* of documents attached to a petition or offered in support of a petition." (*Id.* at 6) (emphasis added). That is, even if § 9005 were read to relax the authentication requirements for documents attached to Lorin's motion for preliminary injunction, Avishay contends the Court would still need to determine whether the exhibits comply with the Federal Rules of Evidence

before admitting them. (*Id.*). Avishay objects to the admissibility of the aforementioned exhibits because they are "replete with hearsay." (*Id.*)

The Court disagrees with Avishay's first argument, but concludes his second argument is well-taken. First, the plain language of ICARA, which implements the Convention in the United States, removes the authentication requirement for "any application to the United States Central Authority, or any petition to a court under section 9003 of this title, which seeks relief under the Convention, *or any other documents or information* included with such application or petition or *provided after such submission which relates to the application or petition*." 22 U.S.C. § 9005 (emphasis added). The exhibits attached to Lorin's motion for preliminary injunction would qualify as documents provided after the submission of her petition, which "relate[] to the application or petition." Thus, pursuant to § 9005, no authentication of the contested exhibits is required for their admission.

But Avishay's second argument makes an important distinction. While the plain language of § 9005 waives the authentication requirement for the contested exhibits, it does not throw open the door to their automatic admission; the Federal Rules of Evidence still apply. Therefore, the Court must determine whether the documents contain inadmissible hearsay as Avishay contends. (Resp., Br., Dkt. 24, at 6). Accordingly, the Court makes the following evidentiary rulings.

As an initial matter, Avishay's text messages to Lorin on July 4, 2018 and July 7, 2018 are statements by a party opponent and are not hearsay. *See* Fed. R. Evid. 801(d)(2). The Court overrules Avishay's objection and admits Exhibit A-4, Respondent Text of July 4, 2018, Dkt. 2-1, at 18–21 and Exhibit A-5, Respondent Text of July 7, 2018, Dkt. 2-3, at 22–24, into evidence.

Lorin's out-of-court statements, while hearsay, are nevertheless admissible under Rule 803(3) as evidence attempting to show her then-existing state of mind regarding habitual residence. *See* Fed. R. Evid. 803(3) (creating an exception to the hearsay rule when the proponent of evidence is attempting to prove "the declarant's then existing state of mind."). The Court overrules Avishay's

7

objection and admits Exhibit A-1, Petitioner's Letter to Respondent with Translation, Dkt. 2-1, into evidence.

Any alleged lease agreements signed by the parties are likewise admissible to show the parties' then-existing state of mind regarding habitual residence. *See* Fed. R. Evid. 803(3). Therefore, the Court overrules Avishay's objection and admits Exhibit C-1, Respondent's 18-month apartment lease, signed July 2018, Dkt. 2-3, at 2–13 and Exhibit C-2, Petitioner's month-to-month apartment lease, Dkt. 2-3, at 14–21.

The Court does not rely on Exhibit F, Original Divorce Petition, Dkt. 2-6, or Exhibit H, Authorized Translation of Israel Capacity and Guardianship Law, Dkt. 2-8, in this order and accordingly declines to make rulings on the admissibility of these exhibits.

### B. The Convention and ICARA

The Convention on the Civil Aspects of International Child Abduction governs civil proceedings filed in signatory countries for the recovery of abducted children. The United States and Israel are signatories to the Convention. ICARA, 22 U.S.C. § 9003 *et seq.*, establishes the procedures for the implementation of the Convention. The Convention and ICARA empower courts to order the return of children removed from their country of habitual residence, not to determine the merits of an underlying custody dispute. 22 U.S.C. § 9001(b)(4); *England v. England*, 234 F.3d 268, 271 (5th Cir. 2000).

Courts do not assess the merits of the underlying custody dispute. Rather, a court's inquiry is limited to determining whether or not the child has been wrongfully removed from their country of "habitual residence." *Berezowsky v. Ojeda*, 765 F.3d 456, 465 (5th Cir. 2014) (citing *Ruiz v. Tenorio*, 392 F.3d 1247, 1250 (11th Cir. 2004)). If the removal or retention was wrongful, the Convention requires that a court order the return of the removed or retained child.

The removal or retention of a child is wrongful if the petitioner proves by a preponderance of the evidence that: (1) the child was retained somewhere other than the child's country of habitual residence; (2) the retention was in breach of petitioner's rights of custody under the laws of the country of habitual residence; and (3) the petitioner was exercising those rights at the time of the retention. Convention, arts. 3, 12.

### C. Habitual Residence

#### 1. Legal Standard

To meet the first element of wrongful retention, Lorin must show by a preponderance of the evidence that Israel was the country of the children's habitual residence at the time of the wrongful retention. *Larbie v. Larbie*, 690 F.3d 295, 310 (5th Cir. 2012). Because wrongful-retention analysis depends on first determining the children's country of habitual residence, the Court will begin with this issue. "The inquiry into a child's habitual residence is not formulaic; rather it is a fact-intensive determination that necessarily varies with the circumstances of each case." *Id.*

"Courts use varying approaches to determine a child's habitual residence, each placing different emphasis on the weight given to the parents' intentions." *Id.* The Fifth Circuit has "adopted an approach that begins with the parents' shared intent or settled purpose regarding their child's residence." *Id.* That approach gives greater weight to the parents' intentions relative to the child's age. *Id.* In cases involving young children, like this one, the threshold question is "whether both parents intended for the child to abandon the [habitual residence] left behind." *Id.* at 310–11. "The mere fact that the parents have consented for the child to move to a new country does not prove that they share the necessary intent to make that new location the child's habitual residence." *Berezowsky*, 765 F.3d at 467.

Cases like this one are difficult because the parents "entitled to fix the child's residence no longer agree on where it has been fixed." *Mozes v. Mozes*, 239 F.3d 1067, 1076 (9th Cir. 2001). In

9

situations like this, the court's task is "to determine when the parents last had a shared plan regarding their child's future and what that plan entailed." *Berezowsky*, 765 F.3d at 468. "In these cases, the representations of the parties cannot be accepted at face value, and courts must determine from all available evidence whether the parent petitioning for return of a child has already agreed to the child's taking up habitual residence where it is." *Mozes*, 239 F.3d at 1076.

These difficult cases can be divided into three broad categories. *Id.* First, there are cases where "the family as a unit has manifested a settled purpose to change habitual residence, despite the fact that one parent may have had qualms about the move." *Id.* "When courts find that a family has jointly taken all the steps associated with abandoning habitual residence in one country to take it up in another, they are generally unwilling to let one parent's alleged reservations about the move stand in the way of finding a shared and settled purpose." *Id.* at 1077. By contrast, there are cases where the move was "clearly intended to be of a specific, delimited period." *Id.* When the evidence clearly indicates that the relocation was intended to be for a limited duration, "courts have generally refused to find that the changed intentions of one parent led to an alteration in the child's habitual residence." *Id.* Then, there are those "in between" cases where the petitioning parent "had earlier consented to let the child stay abroad for some period of ambiguous duration." *Id.* In these cases— "despite the lack of perfect consensus"—the court finds that abandonment of the child's prior residence can be inferred from circumstances surrounding the child's stay suggesting that the parents had a "shared settled mutual intent that the stay last indefinitely." *Id.* at 1078.

2. Parties' Arguments

Lorin contends that the couple never shared an intention to abandon Israel and establish the United States as their children's habitual residence.[3] (Pet. Br., Dkt. 18, at 5). In her view, this case fits

---

[3] Importantly, the couple does not dispute that R.M.A. is a United States citizen, that the couple took no steps to register him as an Israeli citizen, or that R.M.A. has never lived in Israel. (Hr'g, Dkt. 20; *see also* R.M.A. Passport, Dkt. 28-2, at 73).

10

firmly within the second category of cases in which the relocation was "clearly intended to be for a specific, delimited period." *Mozes*, 239 F.3d at 1076. The move to the United States, says Lorin, was always intended to be for a limited, two-year duration so that Avishay could pursue a lucrative job opportunity in Polycom's Austin office. (Pet. Br., Dkt. 18, at 2–3). As evidence that the couple never intended to make the United States the children's habitual residence, Lorin emphasizes that the family entered the United States on nonimmigrant visas and left their "furniture, paintings and other artwork, family memorabilia, personal and business files and other documents" at her parents' house in Israel "with the promise that it would only remain there for two years." (Pet., Br., Dkt. 18, at 2; Photographs of Belongings, Dkt. 27-1, at 11–14). She further points to affidavits from family and friends attesting to the couple's alleged representation that the move would only be for two years. (*See, e.g.*, Karin Anshell Decl., Dkt. 27-1, at 16 ("Avishay told me that they were traveling for work for a limited period of two years."); Revital Meski Decl., Dkt. 27-1, at 18 ("I declare that Avishay decided to fly to the United States for work purposes and that he received a good salary offer for a period of two years."); Mordechai Meski Decl., Dkt. 27-1, at 27 ("I declare that several times Avishay said that he would travel only two years for his work and they would return and continue their lives in Israel.")). As further evidence, she points to letters and text messages between the parties, (Avishay's Letter to Lorin, Dkt. 27-1, at 8; Avishay's Letter to Lorin, Dkt. 28-5, at 7), and an alleged agreement to return to Israel in December 2019, (Agreement, Dkt. 28-5, at 4).

Avishay, on the other hand, argues that the couple never limited the move to Austin to two years. (Resp. Br., Dkt. 19). While Avishay concedes that the couple left Israel uncertain about the exact duration of their stay in the United States, he argues that a shared intent to remain in the United States coalesced once they arrived. (Closing Arg., Dkt. 27). To demonstrate the development of this shared intent, Avishay points to steps the couple took upon arrival to abandon Israel and settle the children in the United States, including discontinuing their Israeli residence status,

11

successfully obtaining legal permanent residency, taking no steps to register R.M.A. as an Israeli citizen after he was born, and signing a new one-year lease for a house in Cedar Park, Texas, approximately three months before the family's two-year anniversary of living in the United States.

3. <u>Analysis</u>

Having considered the objective evidence in this case, the Court concludes that Lorin and Avishay's last shared plan regarding their children's future entailed remaining in the United States indefinitely. *See Berezowsky*, 765 F.3d at 468; *see also Mozes*, 293 F.3d at 1077 (noting that courts may reasonably infer abandonment of the child's prior habitual residence if the court finds the parents had "a settled mutual intent that the stay last indefinitely"). While the parties may have left Israel uncertain about the duration of their stay in the United States, they consistently took steps once they arrived that "manifested a settled purpose" to abandon Israel and establish the children's habitual residence in the United States. *Mozes*, 293 F.3d at 1076 (noting that courts are generally unwilling to credit one parent's alleged reservations about the move when "the family has jointly taken all steps associated with abandoning habitual residence in one country to take it up in another"). A month after the family arrived, Avishay signed a three-year car lease, co-signed by Lorin's uncle. (Lease Agreement, Dkt. 28-4, 14–15). Later that spring, Lorin inactivated her Israeli bar membership. (Letter Israeli Bar Association, Dkt. 28-1, at 38). When Avishay's company agreed to sponsor the family for permanent residency, both Lorin and Avishay took steps to fulfill all necessary requirements, including attending family interviews at USCIS centers, getting fingerprinted, obtaining medical examinations, and receiving all required immunizations.[4] (Hr'g, Dkt. 20, 22). While pursuing legal permanent residency in the United States, both Avishay and Lorin discontinued their Israeli residence status. (Lorin's Residency Letter, Dkt. 28-2, at 66; Avishay's Residency Letter,

---

[4] At the hearing, Lorin testified that she could not recall getting fingerprinted, seeking a USCIS immunization waiver, or signing her green card. (Hr'g, Dkt. 20). But it is unreasonable to believe Lorin could obtain a green card without knowingly participating in the process.

Dkt. 28-2, at 58). When the couple's third child, R.M.A., was born, neither Lorin nor Avishay took any steps to register him as an Israeli citizen. (Hr'g, Dkt. 20, 22). Instead, they obtained a Social Security number for R.MA., (Resp. Br., Dkt. 19, at 2), and a U.S. passport claiming the United States of America as his nationality. (R.M.A. Passport, Dkt. 28-2, at 73). While the parties may have never expressly declared the United States as their habitual residence, their actions belie Lorin's contention that they never intended to abandon Israel. *See Mozes*, 239 F.3d at 1075 ("Nor need the intention be expressly declared, if it is manifest from one's actions; indeed, one's actions may belie any declaration that no abandonment was intended.").

To be sure, Lorin consistently testified at the hearing that she and Avishay never shared an intent to abandon Israel as the children's habitual residence. (Hr'g, Dkt. 20, 22). In light of other aspects of Lorin's testimony, however, the Court does not find this testimony credible. For example, Lorin testified that she knew very little about the permanent residency process and the immigration filings Avishay made on her behalf because of her limited English proficiency and Avishay's failure to directly communicate with her about the process. (Hr'g, Dkt. 20). Yet, text message evidence illustrates that Lorin and Avishay communicated—in Hebrew—about the status of their application for permanent residency. (WhatsApp Msg., Dkt. 28-4, at 27–29). When Avishay texted Lorin that their application had been approved and announced, "[w]e are officially permanent residents of the United States," Lorin only inquired about whether they were "supposed to receive some kind of card" and joked about whether the card would in fact be green. (WhatsApp Msg., Dkt. 28-4, at 29).

Lorin further testified that she could not recall getting fingerprinted, signing her green card, attending USCIS interviews, or requesting the immunization waiver from her doctor that was submitted alongside her application for permanent residency. (Hr'g, Dkt. 20). But Lorin's signature and fingerprint plainly appear on her green card. (*See* Lorin's Green Card, Dkt. 28-2, at 29). Her signature likewise appears on her fully-completed Report of Medical Examination and Vaccination

13

Record (USCIS Form I-693, Dkt. 28-2, at 1), which is accompanied by a letter from an Austin-area doctor, exempting Lorin from all live vaccines, (Immunization Waiver, Dkt. 28-2, at 10).

In light of this evidence, Lorin's testimony that she did not knowingly participate in the permanent residency process is not credible and calls critical aspects of her remaining testimony into doubt. For this reason, the Court finds Lorin's testimony that she and Avishay never intended to abandon Israel as the children's habitual residence to be, likewise, not credible.

Even if the Court did find Lorin's testimony credible, it would still need to consider this testimony in light of all the available evidence. *Berezowsky*, 765 F.3d at 471 ("In cases where there is a dispute regarding a child's habitual residence, the representations of the parties cannot be accepted at face value, and courts must determine habitual residence from all available evidence."). And Lorin's evidence—in light of the consistent steps the family took to settle the children in the United States after their arrival—does not sufficiently show that Israel was the children's habitual residence at the time of the alleged wrongful retention. The Court analyzes each of Lorin's arguments—and the evidence she marshals in support—below.

*Lorin's Arguments and Evidence*

Essentially, Lorin contends the family's move to the United States was always intended to be for a limited duration, a "trial period" like the move in *Murphy v. Sloan*, 764 F.3d 1144, 1152 (9th Cir. 2017). In *Murphy*, the mother moved to Ireland with the couple's young child so that she could pursue a master's degree at an Irish university. *Id.* at 1148. The Ninth Circuit upheld the district court's determination that the father "never intended that the stay in Ireland be anything but a 'trial period.'" *Id.* at 1152. In reaching this conclusion, the district court made a number of factual findings, including that the couple discussed the move as a "trial period," sent notice to the child's preschool informing them that they had "decided to try living in Ireland for a year," stored the mother's belongings in a house purchased by the father in California shortly before the mother

14

departed for Ireland, and planned for the child to spend part of the year in California with her father. Moreover, the mother retained her California driver's license and never obtained an Irish one. *Id.* at 1151.

Lorin's evidence does not similarly show that the couple intended their stay in the United to be for a "trial period." *Id.* at 1152. While Lorin points to affidavits from friends and family attesting to the couple's plan to remain in the United States for a limited two-year period, Avishay's dueling declarations state the opposite: that the couple never settled on a timeframe for their stay. (*See, e.g.*, Idan Werpoler Decl., Dkt. 28-4, at 35 ("Neither Lorin nor Avishay have ever said that their move to the U.S. was only supposed to be for two years."); Hana Amsalem Decl., Dkt. 28-4, at 36 ("When Avishay and Lorin decided to move to the United States, they never said they were moving for two years."); Lital Ten-Ami Decl., Dkt. 28-4, at 37 ("The first time Lorin claimed that the move to Austin was only supposed to be for two years was after Avishay filed for divorce.")). In light of the countervailing assertions in Avishay's declarations, Lorin's declarations do not sufficiently tip the balance toward the conclusion that the couple always intended the move to be limited to a two-year trial period.[5]

Evidence that the couple entered the United States on nonimmigrant visas[6] is likewise insufficient to show the couple never mutually abandoned Israel as the children's habitual residence. While Lorin and Avishay did enter the United States on nonimmigrant L-visas,[7] this does not

---

[5] The Court notes that even if the couple did initially intend for the trip to be for a two-year trial period, that does not foreclose the possibility that the couple's intention to stay permanently—or at least indefinitely— coalesced during that two-year trial period. *Mozes*, 239 F.3d at 1077 ("Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary.").

[6] The Amsalems entered the United States on L-visas, which are issued to an employee, his spouse, and their children upon an employer's petition, based on the employee's executive or managerial capacity or specialized knowledge. *See generally* 8 U.S.C. § 1101(a)(15)(L).

[7] The L-visas were valid for five years rather than two and therefore do little to advance Lorin's argument that the couple always intended for the move to the Untied States to be limited to a two-year period. (*See* Amsalem Family L-visas, Dkt. 28-1, at 32–35).

15

establish that the couple always intended for the children's presence in the United States to be for a limited duration. L-visa holders are not barred from applying to adjust their immigration status; L-visas leave open the possibility of subsequently applying for permanent residency. 8 C.F.R. § 214.2 ("An alien may legitimately come to the United States for a temporary period as an L–1 nonimmigrant and, at the same time, lawfully seek to become a permanent resident of the United States provided he or she intends to depart voluntarily at the end of his or her authorized stay."); *see also Dandamudi v. Tisch*, 686 F.3d 66, 71 (2d Cir. 2012) ("Many nonimmigrant aliens are also often eligible to apply for LPR status."; *Chavan v. Drysdale*, 513 F. Supp. 990, 994–95 (N.D.N.Y. 1981) ("'L' visa holder (should not) be barred from due consideration of an application for adjustment of status if he should subsequently decide to seek permanent residence status in the United States"). When Avishay's employer agreed to sponsor the family for permanent residency, the family took all the necessary steps to adjust their immigration status and apply for permanent residence status in the United States. (*See* Timeline, Dkt. 28-4, at 32*;* USCIS Form I-693, Dkt. 28-2, at 1*;* Amsalem Family Green Cards, Dkt. 28-2, at 29). By October 2016, the Amsalems all had green cards.[8] Entering the United States on nonimmigrant visas in November 2015, therefore, says little about the parties' last shared intent regarding habitual residency. (*See* USCIS Form I-693, Dkt. 28-2, at 1; *see also* Amsalem Family Green Cards, Dkt. 28-2, at 29).

Lorin also points to the furniture, artwork, memorabilia, and other documents the couple stored in her parent's home as evidence the family never mutually intended to abandon Israel. (Pet. Br., Dkt. 18, at 2; Photographs of Stored Belongings, Dkt. 27-1, at 10–14). But storing some of the family's belongings with Lorin's parents in Israel, while potentially indicative of the couple's initial uncertainty about the length of their stay in the United States, is insufficient to discount the other

---

[8] R.M.A., the Amsalem's youngest child, was born in the United States on March 22, 2017. (R.M.A. Birth Certificate, Dkt. 28-2, at 71). R.M.A. is a United States citizen.

16

meaningful steps evincing abandonment that the couple took once they arrived. (*See* Timeline, Dkt. 28-4, at 32). Avishay concedes that the couple did not leave Israel with a shared intent to settle permanently in the United States. (Hr'g., Dkt. 22). Instead, he argues that the intent to habitually reside in the United States coalesced during their first two years in the United States, such that their last shared plan regarding their children's future entailed settling the children in the United States indefinitely. (Closing Arg., Dkt. 26); *see also Mozes*, 239 F.3d at 1067 (noting that a couple's shared intent to abandon the habitual residence left behind can coalesce during the course of a stay abroad originally intended to be temporary). The Court concludes that the steps the family took to settle the children in the United States from November 2015 through November 2017, (*see* Timeline, Dkt. 28-4, at 32), shed more light on the parties' last shared intent regarding habitual residence than the decision to store some of the family's possessions in Israel when they left in November 2015.

Lorin further alleges that the "substantial record of communication" between Lorin and Avishay "in the form of letters and social media texts" demonstrates that "there was never a shared intention to abandon Israel as the habitual residence of the children." (Pet., Br., Dkt. 18, at 2). Specifically, Lorin points to two letters Avishay wrote to her, one letter stating, among other things: "You and the children are important to me and after thinking about it, I am willing to give up citizenship and return to Israel next December and work together on our problems. In order for this to succeed, I would like us to agree on the following . . . ." (Avishay's Letter to Lorin, Dkt. 28-5, at 7) and the other stating:

> When we arrived, I thought it would be an adventure and we could finish it in 3 years. We talked about it enough, but I do not think we'll agree. I would certainly like to live here in the future, but if this is not possible, I see citizenship as an insurance that we will have as a family and the possibility of returning to work here in any case we would like in the future. A lot of people switch with us in the second but I realized there is no chance of convincing you. That's why I said I'm ready to return to Israel as soon as we get the citizenship. You are willing to give up a year and a half and I want to stay for 3 years (we will apply for citizenship as early as July 2021). I request that you agree to stay two years instead of a year and a half, and I will travel back and forth to maintain our right for citizenship. I

17

> understand that this will not be easy, but let me understand that you can be flexible.

Avishay's Letter to Lorin, Dkt. 27-1, at 8).

But these letters do not show that the couple never intended to abandon Israel, as Lorin suggests. (Pet., Br., Dkt. 2, at 18). By the time Avishay sent these letters to Lorin, the family had already taken concrete steps to establish habitual residency in the United States. *See supra*. While Avishay may have "thought it would be an adventure [they] could finish in 3 years" when they arrived, the evidence suggests the family took steps to establish permanent residency in the United States in the intervening years. (Amsalem Family Green Cards, Dkt. 28-2, at 29). Moreover, because the evidence shows that parties' intent to abandon Israel coalesced between November 2015 and November 2017, any evidence proffered by Lorin as to the couple's intentions after November 2017 would need to establish the couple's shared intent to abandon *the United States* as the children's country of habitual residence. At most, the letters show an attempt to negotiate the terms of a possible return to Israel—not a settled agreement to do so. And even if they had reached such an agreement, it is indisputable that the children continued to reside in the United States. To change the children's habitual residence back to Israel, the family would need to move back to Israel and spend an appreciable amount of time there. *Barzilay v. Barzilay*, 600 F.3d 912, 920 (8th Cir. 2010) ("[H]abitual residence may only be altered by a change in geography and passage of time. It follows that it may not be altered by simple parental fiat.").

The alleged agreement between Avishay and Lorin suffers from the same weakness as the letters exchanged between the couple: it does not show that the children's habitual residence in June 2018—the date of the alleged wrongful retention—was anywhere but the United States. Although "the decision to alter a child's habitual residence depends on the settled intention of the parents, they cannot accomplish this transition by wishful thinking alone." *Mozes*, 600 F.3d at 1078. Avishay contends—and the Court agrees—that once the parties took steps to establish the children's

habitual residence in the United States, they could not change their habitual residence back to Israel without moving back to Israel for an appreciable period of time. *See Barzilay*, 600 F.3d at 920; *see also Mozes*, 239 F.3d at 1078 (noting that altering a child's habitual residence "requires an actual change in geography and the passage of an appreciable period of time."). No significant change in the children's living arrangements occurred between November 2015 and June 2018, the date of the alleged wrongful retention. Thus, the Court concludes that the alleged May 2018 agreement between the parties did not alter the children's habitual residence back to Israel.

Furthermore, Lorin's contention that the family always intended to return to Israel after Avishay's two-year employment with Polycom's Austin office cannot be squared with the couple's conduct leading up to the family's two-year anniversary in the United States. R.M.A. was born in March 2017—eight months before the two-year mark. (R.M.A. Birth Certificate, Dkt. 28-2, at 71). Neither Lorin nor Avishay took steps to register him as an Israeli citizen; in fact, the couple took steps to solidify R.M.A.'s residency in the United States by applying for and ultimately obtaining a U.S. passport, (R.M.A. Passport, Dkt. 28-2, at 73), and Social Security number, (R.M.A. Social Security Card, Dkt. 28-2, at 72) for him. Approximately two weeks before the family's two-year anniversary in the United States, the couple purchased *roundtrip* airline tickets to Israel, departing on July 19, 2018, and returning to Austin on August 3, 2018. (Roundtrip Airline Tickets, Dkt. 28-2, at 74–98). Even if "perfect consensus" about how long the family would remain in the United States did not exist, their behavior as the two-year mark approached suggests they at least had a "shared settled mutual intent that the stay last indefinitely." *Mozes*, 239 F.3d at 1078 (noting that when the court finds the circumstances suggest that the parents "shared a settled mutual intent that the stay last indefinitely," the court "can reasonably infer a mutual abandonment of the child's prior habitual residence.").

Ultimately, Lorin's evidence, in light of all steps taken by the family unit "manifest[ing] a settled purpose to change [the children's] habitual residence" to the United States, is insufficient to show, by a preponderance of the evidence, that the children's habitual residence at the time of the alleged wrongful retention in June 2018 was Israel. *Id.* at 1076. At most, Lorin's evidence indicates that the parties had not settled on the intention to abandon Israel when they departed and that she harbored reservations about settling the children in the United States more permanently. But the objective evidence shows that such an intention coalesced during the course of their time in the United States. *Id.* at 1067 ("Of course, one need not have this settled intention at the moment of departure; it could coalesce during the course of a stay abroad originally intended to be temporary."). And "[o]nce a family jointly takes steps to abandon the prior habitual residence, one parent's reservations do not negate shared intent." *Loftis v. Loftis*, 67 F. Supp. 3d 798, 808 (S.D. Tex. 2014) (citing *Mozes*, 239 F.3d at 1077).

## IV. CONCLUSION

Because Lorin has not shown that Israel was the children's country of habitual residence at the time of the alleged wrongful retention, the Court finds that Lorin has not met her burden to establish by the preponderance of the evidence that Avishay wrongfully retained the children in the Untied States. Accordingly, **IT IS ORDERED** that Lorin's Verified Petition for Return of Minor Children to Their Habitual Residence (Israel), (Dkt. 1), is **DENIED**.

**SIGNED** on December 20, 2019.

ROBERT PITMAN
UNITED STATES DISTRICT JUDGE

20